SIERRA CLUB, INC.; Alliance for the Wild Rockies, Plaintiffs—Appellees,

v.

Deborah AUSTIN, in her official capacity as Forest Supervisor for the Lolo National Forest, Defendant,

and

United States Forest Service, an agency of the U.S. Department of Agriculture, Defendant—Appellee,

Mineral County; Town of Superior; St. Regis School District; Superior School District No. 3; Montana Coalition of Forest Counties; Tricon Timber, LLC, Defendants–Intervenors—Appellants.

Sierra Club, Inc.; Alliance for the Wild Rockies, Plaintiffs—Appellees,

v.

Deborah Austin, in her official capacity as Forest Supervisor for the Lolo National Forest; United States Forest Service, an agency of the U.S. Department of Agriculture, Defendants—Appellants,

and

Mineral County; Town of Superior; St. Regis School District; Superior School District No. 3; Montana Coalition of Forest Counties; Tricon Timber, LLC, Defendants–Intervenors.

Sierra Club, Inc.; Alliance for the Wild Rockies, Plaintiffs—Appellants,

v.

Deborah Austin, in her official capacity as Forest Supervisor for the Lolo National Forest, Defendant,

and

United States Forest Service, an agency of the U.S. Department of Agriculture, Defendant—Appellee,

Mineral County; Town of Superior; St. Regis School District; Superior School District No. 3; Montana Coalition of Forest Counties; Tricon Timber, LLC, Defendants–Intervenors—Appellees.

Nos. 03–35419, 03–35537, 03–35550. D.C. No. CV–03–00022–DWM.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 2003.

Decided Dec. 2, 2003.

Timothy A. Bechtold, Rossbach Hart Bechtold, LLP, Missoula, MT, Eric E. Huber, Boulder, CO, for Plaintiffs–Appellees.

Barclay T. Samford, U.S. Department of Justice, Aaron P. Avila, Washington, DC, Victoria L. Francis, USMO–Office of the U.S. Attorney, Billings, MT, for Defendant/Defendant–Appellee.

Scott W. Horngren, Haglund Kirtley Kelley Horngren & Jones, LLP, Portland, OR, M. Shaun Donovan, DCC, Mineral County Attorney, Superior, MT, for Defendants–intervenors–Appellants.

Claudia L. Massman, Helena, MT, for Amicus.

Before D.W. NELSON, KOZINSKI, and McKEOWN, Circuit Judges.

## MEMORANDUM *

■ The National Environmental Protection Act (NEPA) requires the Forest Service to take a "hard look" at the environmental impact of a proposed major federal action. *See* 42 U.S.C. § 4332. The Forest Service's assessment of the Lolo Post Burn Project's effect on water quality satisfied NEPA's requirements and was not arbitrary and capricious. The Environmental Impact Statement (EIS) included extensive discussion of the project's effects on water quality. The Forest Service analyzed the environmental impact of sedimentation estimates for each of the proposed alternatives, including the no-action alternative, in comparative form by using the water quality model LOLOSED. *See* 40 C.F.R. § 1502.14 (requiring the EIS to present the environmental impacts of proposed alternatives in comparative form). The Forest Service's analysis clearly indicates that the project's overall impact on water quality will be positive. Compared to the no-action alternative, the project will significantly reduce sedimentation in the affected streams after the first few years.

■ The Sierra Club's argument that the Forest Service was required to determine how much sediment the streams could assimilate before implementing the project is unpersuasive. NEPA is a procedural statute, not a substantive one. No substantive law requires such a determination and thus the district court's ruling that the Forest Service was required to await the completion of TMDLs (Total Maximum Daily Load) before implementing the Lolo Post Burn Project was without legal foundation and is therefore reversed. In turn, the injunction must be dissolved.

■ The Lolo Post Burn Project EIS was extensive and detailed in its presentation of the effects of logging on the Inventoried Roadless Areas (IRAs). Ultimately, no logging will occur in the IRAs. The IRAs must, however, be distinguished from the unroaded areas. Although the EIS takes care to define these distinct areas separately, it does not follow through in its analysis of the effects of logging on the unroaded areas. And, although the EIS was not completely silent as to the effects of logging on the unroaded areas, the cursory references do not satisfy the necessary "hard look" at the project's environmental impact that is required by NEPA.

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

The conclusion in the Record of Decision (ROD) that there would be no "irreversible and irretrievable commitment of the resource" because "no permanent road construction will occur in these areas" ignores the potential impact of logging. The decision does not assess the effects of logging but instead focuses solely on road construction. It is well established in this circuit that logging in an unroaded area is an "irreversible and irretrievable" commitment of resources that "could have serious environmental consequences." *Smith v. U.S. Forest Service*, 33 F.3d 1072, 1078 (9th Cir.1994) (internal quotations and citations omitted).

The Forest Service failed to address the effects of logging in the unroaded areas on their characteristics vis-a-vis potential for future wilderness or IRA designation. The decision to defer analysis until the Forest Plan revision is undertaken several years hence in 2006 essentially results in the effects analysis taking place after the action. In other words, the logging will occur first and the analysis will occur later. The choice to commence logging under the Lolo Post Burn Project implicates and constrains future decisions regarding the project areas. *See California v. Block*, 690 F.2d 753, 762–63 (9th Cir.1982) (explaining that future evaluation of wilderness qualities is meaningless if the area will no longer be managed in a manner consistent with wilderness preservation by the time the evaluation occurs). For these reasons, "NEPA requires consideration of the potential impact of an action *before* the action takes place." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir.1998) (internal quotations and citations omitted).

In contrast to the EIS's thorough analysis of the project's potential effect on the IRAs, the discussion of the impact on unroaded areas was superficial and largely conclusory.[1] There was no analysis of the project's impact on the unique values of unroaded areas, which the Forest Service has previously acknowledged. *See* 65 Fed. Reg. 30276, 30281–83 (describing unique values of unroaded areas). Nor was there any analysis of the project's impact on the potential for the unroaded areas to be designated as IRAs or wilderness in the future. Additionally, the EIS did not reference the impact of logging on unroaded areas contiguous to IRAs. Simply disclosing the fact that the unique qualities of the unroaded areas may be diminished does not suffice. A conclusion with no analysis does not meet NEPA's standard. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (stating that "general statements about 'possible' effects ... do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.") (quoting *Neighbors of Cuddy Mountain*, 137 F.3d at 1380). It can hardly be called nitpicking to require the barest minimum of analysis with respect to the characteristics of the unroaded areas.

For these reasons, the ROD and the underlying EIS did not satisfy the "hard look" requirement with respect to the environmental impact of logging on unroaded areas. The district court's summary judgment in favor of the Forest Service with respect to logging in the unroaded areas is reversed and remanded for proceedings consistent with this disposition.

---

1. The dissent clouds the analysis by conflating its discussion of the IRAs and the unroaded areas. Much of the analysis cited by the dissent focuses on IRAs rather than unroaded areas. *See* FEIS Ch. 3.10 (including several pages discussing IRAs but only a few paragraphs which specifically address unroaded areas).

**REVERSED AND REMANDED.** Each party shall pay its own costs on appeal.

KOZINSKI, Circuit Judge, dissenting in part.

After the 2000 wildfires tore through the Lolo National Forest, burning 74,000 acres, the Forest Service was confronted with the daunting task of devising a response to this devastating natural disaster. The agency selected a project that would deal with the disaster on two fronts: restoration and recovery of watersheds and restoration and recovery of land. The project would include, among other things, planting 12,000 acres in areas where natural regrowth is absent due to the severity of the fires; commercially thinning 10,000 acres of unburned timber and timber burned by low-intensity fires; salvaging 5,000 acres of fire-damaged, dead and dying timber; salvaging 100 acres of insect-killed timber; constructing three miles of temporary roads to access the treatment areas; and closing 140 miles of unneeded roads. Lolo Nat'l Forest Post Burn Final Envtl. Impact Statement S–2. The need to undertake such measures promptly should be particularly obvious to those of us who live in Southern California.

As commanded by NEPA, 42 U.S.C. § 4332, the agency prepared a comprehensive Environmental Impact Statement rife with detailed analysis of the project's impact on the environment, including on unroaded areas. *See* FEIS Ch. 3.10 and 4.5. The EIS exceeds 1,100 pages and devotes 250 pages to analysis of the affected environment, EIS Ch. 3, and more than 160 pages to analysis of the project's environmental consequences, EIS Ch. 4. It contains over 150 detailed maps and even includes instructions on how to read it.

The agency involved the community in its decisionmaking process, holding "pre-scoping" meetings in areas most affected by the fires, EIS S–3, and mailing information packets to 1,361 interested individuals and organizations, EIS S–4. It held open houses, educated area students, conducted public tours and published notices and information in local newspapers. *Id.* It involved the United States Environmental Protection Agency and the Montana Department of Environmental Quality, and both expressed their support of the project. EIS S–5. It published a draft EIS and solicited public comments, which were extensive, and responded to them in a thorough, reasoned manner, *see* Lolo National Forest Post Burn EIS Response to Comments (Appendix I), *available at* http://www.fs.fed.us/rl/lolo/projects/ post-burn/feis/docs/q-i-res-com.pdf. The responses to public comments alone comprise nearly 200 pages of the final EIS. After its extensive public education campaign and involvement of interested parties, the agency weighed the positive effects of the project against the negatives and decided to adopt it.

As it turns out, the project will actually increase the amount of unroaded acreage by decommissioning 224 miles of roads, ROD–15, thereby adding nearly 2,000 acres of additional unroaded area, *see* FEIS 4–26. My colleagues never acknowledge this benefit. Nor do they mention that 60 percent of the harvest will be conducted by helicopter, minimizing any trace of harvesting, and that the majority of the harvest will occur in burned areas, which are already marred by the fires. FEIS 4–27.

The majority's claim that there was no "analysis of the project's impact on the potential for the unroaded areas to be designated as IRAs or wilderness in the future," Memdispo at 7, is simply untrue. The agency candidly admitted that the harvest in unroaded areas might "have an

effect on the apparent naturalness and natural integrity of these areas and thus may reduce their potential for being reallocated to Inventoried Roadless or Wilderness Areas under the Forest Plan revision process," ROD–28, but concluded that, whatever the negative impact, it won't be irreversible because of the mitigating measures the agency plans to take. *See* FEIS 4–27 (discussing the use of helicopter yarding and temporary roads). This was reasonable in light of Forest Service regulations allowing previously harvested areas to be classified as wilderness "where logging and prior road construction are not evident." Forest Service Handbook 1909.12, Ch. 7.11a(9).

My colleagues complain that Chapter Three of the EIS devotes fewer pages to unroaded areas than to Inventoried Roadless Areas. *See* Memdispo at 7 n. 1. Whether an agency has given an issue the requisite hard look should not depend on how many pages of a report are devoted to it. Nonetheless, the majority's allegation that Chapter Three devotes "only a few paragraphs" to unroaded areas is wrong. Chapter Three devotes nearly five pages to listing every unroaded area and describing its general characteristics. *See* FEIS 3–66 to 3–70. Moreover, the unroaded discussion does not end with Chapter Three. The majority overlooks Chapter Four, titled "Environmental Consequences," which devotes seven pages to discussion of unroaded areas compared to five pages to discussion of Inventoried Roadless Areas. *Compare* FEIS 4–23 to 4–29 *with* FEIS 4–18 to 4–23. Chapter 4.5.3, titled "Effects on Unroaded Resources," analyzes the effects of each proposed alternative on the various unroaded areas. It discusses the impact on naturalness, changes in the land's appearance, how long it would take for regeneration, the density of the trees and even potential for weed spread. *See* FEIS 4–23 to 4–28.

In addition, Chapter Four contains two long tables regarding vegetation management activities, one describing the treatment type and yarding system to be used in each unroaded area under proposed alternative four, FEIS 4–26 to 4–27, and the other providing that information for proposed alternative five, FEIS 4–28 to 4–29. Cursory this is not.

As my colleagues acknowledge, "NEPA is a procedural statute, not a substantive one." Memdispo at 4. Our role is limited to making " 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.' " *Churchill County v. Norton,* 276 F.3d 1060, 1071 (9th Cir.2001) (quoting *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982)). The agency identified the effects of the proposed project—both good and bad—and made an informed, reasoned decision. The attention given to the unroaded issue more than meets the statutory requirements.

The majority cites *Smith v. U.S. Forest Service,* 33 F.3d 1072, 1078 (9th Cir.1994), for the proposition that "logging in an unroaded area is an irreversible and irretrievable commitment of resources that could have serious environmental consequences." Memdispo at 5 (internal quotations omitted). But in *Smith,* the agency failed to independently consider the impact of a timber *sale* on roadless resources. An ordinary sale does not present the kind of exigency created by a natural disaster. Moreover, the agency's review there really was deficient because it did not look at the effect of the sale on unroaded resources at all. *Id.* at 1078–79. Here, the agency compiled a massive, detailed report analyzing the impact on unroaded resources and concluded that, despite some drawbacks, the benefits made the project worth pursuing. Moreover, it arrived at this decision after considering and responding to public

comments on this precise issue. *See* Response to Comments 164–65. Because satisfying the majority's nitpicking (including at least another round of judicial review) will needlessly delay by at least two years a much-needed response to an emergency that is already three years old, I respectfully dissent from that portion of the memorandum disposition dealing with the unroaded areas.