WILDERNESS PUBLIC RIGHTS FUND, a nonprofit California Corporation, Plaintiff-Appellant,

v.

Thomas F. KLEPPE, Secretary of Interior, Department of the Interior, Gary Everhardt, Director of the National Park Service, Howard H. Chapman, Regional Director of the Western Region of the National Park Service, and Merle Stitt, Superintendent of Grand Canyon National Park, Defendants-Appellees.

Frederick B. EISEMAN, Jr., and Margaret H. Eiseman, husband and wife, J. R. Hertzler, Michael St. Clair, Plaintiffs-Appellants,

v.

Thomas F. KLEPPE, in his capacity as Secretary of the U. S. Department of Interior, Gary Everhardt, in his capacity as Director of the National Park Service, and Merle Stitt, in his capacity as Superintendent of Grand Canyon National Park, Defendants-Appellees.

Nos. 77–1606, 77–3693.

United States Court of Appeals, Ninth Circuit.

As Amended on Nov. 1, 1979. Denial of Rehearing and Rehearing En Banc Dec. 17, 1979.

Donald P. Nemir, Inc., San Francisco, Cal., Bruce E. Meyerson, Phoenix, Ariz., argued, for plaintiff-appellant.

Carl Strass, Washington, D.C., argued, for defendants-appellees; Richard S. Allemann, Asst. U. S. Atty., Phoenix, Ariz., on brief.

Before MERRILL and ANDERSON, Circuit Judges, and SKOPIL,* District Judge.

MERRILL, Circuit Judge:

These cases involve the manner in which use of the Colorado River for rafting and boating is apportioned between concessioners approved by the National Park Service and noncommercial users. Permits from the National Park Service are required for river use and the dispute here concerns the apportionment made in granting permits.

In December, 1972, the Secretary of the Interior found that the boating and rafting use of the Colorado River in the Grand Canyon National Park had experienced such an increase that it posed a threat to the ecology of the river. A study was initiated for the purpose of ascertaining river capacity and it was decided that until completion of the study use of the river should be frozen at the 1972 level. Accordingly, river use was limited to 96,600 user days per year (a user day being one day spent on the river by one person). This total use was apportioned between two user groups in the ratio of actual 1972 use by each group: 89,000

---

* Honorable Otto R. Skopil, Jr., now a member of this court, was, at the time of the hearing in this matter, Chief United States District Judge of the District of Oregon, sitting by designation.

user days or 92 percent of the total use was allotted to commercial concessioners of the Park Service who, for a fee, make guided trips through the canyon; 7,600 user days or 8 percent of the total was allotted to noncommercial users who apply for permits as private groups. Noncommercial users for the most part are experienced in river running and furnish their own equipment and supplies. Expenses are shared, as is the performance of the necessary duties involved. Permits for river use and the apportionment thereof have remained frozen at the 1972 level.

Appellants are, or represent, noncommercial river runners who, on various grounds, challenge the apportionment between commercial and noncommercial users. They assert that they, or those they represent, have applied for permits from the Park Service which were denied, the Service instead having granted permits to persons who used them for commercial purposes. In January, 1975, a member of Wilderness Public Rights Fund petitioned the Secretary for a change in the allocation system for the issuance of permits. The request was denied.

Both actions before us assert jurisdiction under the judicial review portions of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* The Wilderness Public Rights Fund action was brought in the Northern District of California in June, 1976. As relief it sought an injunction staying the issuance of permits for river use to commercial permittees and concessioners "until such time as it can be determined to what extent commercial services are necessary and appropriate." It sought a declaration that noncommercial users are entitled to priority over commercial users.

The Eiseman action was brought in the District of Arizona in March, 1977. It was more modest in its claims and in the relief sought. It did not seek priority for the noncommercial users over the commercial users. It sought equal access to the river and an order directing the Secretary and the Service to implement a plan providing equal access.

In both cases summary judgment in favor of appellees was granted and these appeals followed.

A number of statutes and regulations bear on the issues of these actions. 16 U.S.C. § 1 creates the National Park Service (hereinafter NPS) in the Department of the Interior and directs it to "promote and regulate the use of the Federal areas known as national parks, monuments and reservations * * * by such means and measures as conform to the fundamental purpose of said parks, monuments and reservations * * *." That purpose is stated to be "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

16 U.S.C. § 3 provides in part:

"The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service * *. He may also grant privileges, leases, and permits for the use of land for the accommodation of visitors in the various parks, monuments or other reservations [herein provided for] but for periods not exceeding thirty years; and no natural curiosities, wonders, or objects of interest shall be leased, rented, or granted to anyone on such terms as to interfere with free access to them by the public * * *."

Pursuant to this authority the Secretary has promulgated 36 C.F.R. § 7.4(h)(3) as follows:

"(3) No person shall conduct, lead, or guide a river trip unless such person possesses a permit issued by the Superintendent, Grand Canyon National Park. The National Park Service reserves the right to limit the number of such permits issued, or the number of persons travelling on trips authorized by such permits when, in the opinion of the National Park Service, such limitations are necessary in

the interest of public safety or protection of the ecological and environmental values of the area."

The Concessions Policy Act, 16 U.S.C. § 20 provides in part:

"It is the policy of the Congress that such development [concessions] shall be limited to those that are necessary and appropriate for public use and enjoyment of the national park area in which they are located * * *."

Appellants first attack the failure of the NPS to follow the dictates of the Administrative Procedure Act. They contend that the allocation of user days between commercial and noncommercial users amounted to rule making and that no hearings were held where the noncommercial users could present their views, contrary to the requirements of the Administrative Procedure Act.

■ That Act, 5 U.S.C. § 553(a)(2), excepts from the rule-making procedures "a matter relating * * * to public property, loans, grants, benefits or contracts." The government contends that this exempts the action of the Secretary in freezing the 1972 river use and apportioning that use between the commercial and noncommercial users. We agree. *Cf. Duke City Lumber Co. v. Butz*, 382 F.Supp. 362, 378 (D.D.C. 1974), *aff'd in part*, 176 U.S.App.D.C. 218, 539 F.2d 220 (D.C.Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977).

Appellants contend that allocation between commercial and noncommercial use of the river is not an acceptable method of accomplishing a limitation of river use. They propose that anyone wishing to run the river should apply for a permit, leaving to him, if his application be granted, the choice between joining a guided party or a noncommercial party; that permits then be granted by lottery or on a first-come-first-served basis. They assert that the record establishes that such a method is feasible. They contend that there is no justification for allocating between commercial and noncommercial use, and that to do so amounts to arbitrary action; that it denies them "free access" to the river contrary to 16

U.S.C. § 3 and permits development by concession to a degree in excess of that allowed by the Concessions Policy Act. We disagree.

■ The Secretary of the Interior, acting through the NPS, has the wide ranging responsibility of managing the national parks. 16 U.S.C. § 3. *Universal Interpretive Shuttle Corp. v. WMATC*, 393 U.S. 186, 187, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968); *Udall v. Washington, Virginia & Maryland Coach Co.*, 130 U.S.App.D.C. 171, 398 F.2d 765 (D.C.Cir. 1968), *cert. denied*, 393 U.S. 1017, 89 S.Ct. 620, 622, 21 L.Ed.2d 561 (1969). Pursuant to this authority, the NPS regulates use of the Colorado River through the permit requirement described in 36 C.F.R. § 7.4(h)(3), *supra*. In issuing permits, the Service has recognized that those who make recreational use of the river fall into two classes: those who have the skills and equipment to run the river without professional guidance and those who do not. The Service recognizes its obligation to protect the interests of both classes of users. It can hardly be faulted for doing so. If the over-all use of the river must, for the river's protection, be limited, and if the rights of all are to be recognized, then the "free access" of any user must be limited to the extent necessary to accommodate the access rights of others. We must confine our review of the permit system to the question whether the NPS has acted within its authority and whether the action taken is arbitrary. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Allocation of the limited use between the two groups is one method of assuring that the rights of each are recognized and, if fairly done pursuant to appropriate standards, is a reasonable method and cannot be said to be arbitrary. It is well within the area of administrative discretion granted to the NPS.

■ Throughout these proceedings Wilderness Public Rights Fund has persisted in viewing the dispute as one between the recreational users of the river and the commercial operators, whose use is for profit.

It asserts that by giving a firm allocation to the commercial operators to the disadvantage of those who wish to run the river on their own the Service is commercializing the park. The Fund ignores the fact that the commercial operators, as concessioners of the Service, undertake a public function to provide services that the NPS deems desirable for those visiting the area. 16 U.S.C. § 20a. *See, Universal Interpretive Shuttle Corp. v. WMATC, supra.* The basic face-off is not between the commercial operators and the noncommercial users, but between those who can make the run without professional assistance and those who cannot.

While the Concessions Policy Act, 16 U.S.C. § 20, *supra*, expresses the congressional intent that the granting of concessions shall be limited to "those that are necessary and appropriate for public use and enjoyment" of the park involved, the authority for the granting of concessions is given to the Secretary by 16 U.S.C. § 3, and there is no showing here of arbitrary action or abuse of that authority.

█ Appellants also complain that noncommercial applicants receive unfair and unequal treatment at the hands of the Service. They must apply to the Service for permits and thus must plan their trips well in advance. Deadlines must be met. The names of all in the proposed party (with signatures) must be set forth. Those who make the trip under guide may deal directly with the concessioners and make arrangements at the last minute. This comports with the NPS' right to regulate river trips in the interests of safety. 36 C.F.R. § 7.4(h)(3). We find nothing unreasonable in thus assuring, as matter of safety, that those who make the trip on their own without concessioners' supervision have undertaken the necessary preparation and possess the necessary skill to participate in the activities involved.

█ We conclude that allocation between the two classes of recreational users is not per se an arbitrary method of recognizing and accommodating the interests of the two classes. The question remaining is whether allocation has been fairly made pursuant to appropriate standards.

█ There is a judicial presumption favoring the validity of administrative action. *See Duesing v. Udall*, 121 U.S.App.D.C. 370, 350 F.2d 748 (D.C.Cir.1965), *cert. denied*, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966). Where several administrative solutions exist for a problem, courts will uphold any one with a rational basis, but the Secretary's balancing of competing uses must not be an arbitrary one. *Udall v. Washington, Virginia and Maryland Coach Co., supra.*

█ Appellants challenge the method used by the Park Service in determining allocation between the classes of users for the reason that it is founded on 1972 data. It is asserted that since that year there has been a substantial increase in the demand for use by noncommercial users, and that to freeze allocation of use on the basis of seven-year-old data in the face of rapid change is arbitrary and unreasonable.

We are informed, however, that the study initiated by the National Park Service has now been completed and that the interim basis for allocation between the two classes of users—freezing at the 1972 level—is being abandoned. A proposed management plan for the river and a draft environmental impact statement have been completed and published. The allocation departs from the 1972 level of 92 percent user days for commercial operators and 8 percent user days for noncommercial river runners. Under the plan, 70 percent of the user days will be allocated for commercial trips and 30 percent for noncommercial trips. The period assigned for comment has expired and it is anticipated that a final plan will be forthcoming in a matter of weeks.

This renders moot challenges to the specifics of the interim management plan, now about to be superseded by a final plan. The basis for the claim of arbitrariness—that the freezing of use and allocation of use at the 1972 levels is, in 1979, unreasonable—falls from the case.

Judgment affirmed.