**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RIVER RUNNERS FOR WILDERNESS;
ROCK THE EARTH; WILDERNESS
WATCH; LIVING RIVERS, nonprofit
corporations,
         *Plaintiffs-Appellants,*

         v.

STEPHEN P. MARTIN, in his official
capacity as Superintendent of
Grand Canyon National Park;
DIRECTOR OF THE NATIONAL PARK
SERVICE; NATIONAL PARK SERVICE;
KENNETH L. SALAZAR, in his
official capacity as Secretary of
the U.S. Department of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
DIANE J. HUMETEWA; ERIC H.
HOLDER JR.,
         *Defendants-Appellees,*

GRAND CANYON RIVER OUTFITTERS
ASSOCIATION; GRAND CANYON
PRIVATE BOATERS ASSOCIATION,
         *Defendant-Intervenors-*
         *Appellees.*

No. 08-15112

D.C. No.
CV-06-00894-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
June 10, 2009—San Francisco, California

Filed February 1, 2010

Before: Procter Hug, Jr., Betty B. Fletcher and
Michael Daly Hawkins, Circuit Judges.

Per Curiam Opinion

---

## COUNSEL

Julia A. Olson, Wild Earth Advocates, Eugene, Oregon, and Matthew K. Bishop, Western Environmental Law Center, Helena, Montana, for the plaintiffs-appellants.

Charles R. Scott, Attorney, United States Department of Justice, Washington, D.C., for Federal appellees.

Sam Kalen, Van Ness Feldman, PC, Washington, D.C., for defendant-intervenor-appellee Grand Canyon River Outfitters Association.

Lori Potter, Kaplan Kirsch & Rockwell LLP, Denver, Colorado, for defendant-intervenor-appellee Grand Canyon Private Boaters Association.

---

## OPINION

PER CURIAM:

This case concerns the National Park Service's decision to permit the continued use of motorized rafts and support equipment in Grand Canyon National Park. Plaintiffs contend that such motorized activities impair the wilderness character of the Canyon and that the Park Service's decision violates its management policies and various federal statutes. Plaintiffs asked the District Court to set aside the decision under the Administrative Procedure Act ("APA"). For reasons

explained in this opinion, Plaintiffs have not satisfied the high threshold required to set aside federal agency actions under the APA.[1]

## I.  Background.

Grand Canyon National Park ("Park") was established by Congress in 1919 and expanded in 1975. The Park consists of more than 1.2 million acres located on the southern end of the Colorado Plateau in Arizona.

The Park includes a 277-mile stretch of the Colorado River referred to in this order as the "Colorado River Corridor" or the "Corridor." The Park Service regulates the Colorado River Corridor through a periodically-revised Colorado River Management Plan ("Management Plan"). In November of 2005, the Park Service issued a Final Environmental Impact Statement ("FEIS") for the 2006 Management Plan. On February 17, 2006, the Park Service issued a Record of Decision ("ROD") that adopted and approved the 2006 Management Plan. The 2006 Management Plan permits the continued use of motorized rafts, generators, and helicopters in the Colorado River Corridor.

Plaintiffs River Runners for Wilderness, Rock the Earth, Wilderness Watch, and Living Rivers constitute a coalition of organizations committed to protecting and restoring the Grand Canyon's wilderness character and unique natural resources and ensuring fair access to it. Plaintiffs filed this action against the Park Service and various individual Defendants.[2]

---

[1] The wording of Judge Campbell's carefully crafted district court opinion with its detailed factual discussion and thorough analysis, with which we agree, has been utilized in this opinion.

[2] The named individual Defendants included Joseph F. Alston, superintendent of the Park; Fran Mainella, director of the Park Service; Gale Norton, Secretary of the United States Department of the Interior; the Department of the Interior; Paul K. Charlton, former United States Attorney for Arizona; and Alberto R. Gonzales, former Attorney General.

The district court subsequently permitted two private organizations to intervene in the action — Grand Canyon River Outfitters Association, which consists of commercial operators of motorized and non-motorized rafts in the Colorado River Corridor, and Grand Canyon Private Boaters Association, which consists of private rafters and kayakers of the Corridor (collectively, "Intervenors").

Following exchanges of information and compilation of the administrative record, Plaintiffs, Defendants, and Intervenors all filed motions for summary judgment. The district court held oral argument on October 26, 2007.

### A. Park Service Management of the Colorado River Corridor.

The waters of the Colorado River originate in the mountains of Colorado, Wyoming, and Utah and run 1,450 miles to the Gulf of California. The Colorado is the longest and largest river in the Southwestern United States. Once in the Grand Canyon, the river flows some 4,000 to 6,000 feet below the rim of the Canyon through cliffs, spires, pyramids, and successive escarpments of colored stone. Access to the bottom of the Grand Canyon can be gained only by hiking, riding mules, or floating the river. Those floating the river typically do so in motor-powered rubber rafts, oar- or paddle-powered rubber rafts, oar-powered dories, or kayaks. Floating the river through the Grand Canyon is considered one of America's great outdoor adventures and includes some of the largest white-water rapids in the United States.

Use of the Colorado River Corridor increased substantially after Glen Canyon Dam was completed in 1963 and produced a relatively steady flow through the Canyon. Because of this increased use, the Park Service initiated a series of river planning and management efforts, culminating in a December 1972 River Use Plan. The plan concluded that "motorized craft should be phased-out of use in the Grand Canyon." The

plan also concluded that 89,000 commercial user days and 7,600 non-commercial user days would be allocated for the 1973 season, but that commercial use would be scaled down to 55,000 user days by 1977.[3] A 1973 Draft Environmental Impact Statement concluded that "[t]he use of motors . . . should be eliminated as soon as possible from the river environment" and that "[t]he propose[d] elimination of motorized trips will . . . hav[e] a positive environmental impact."

The Park Service initiated a Colorado River Research Program in 1974 to examine, among other things, the impact of motorized activities on the river. In September of 1977, the Park Service issued a document suggesting that "the use of motors is contrary to established health and safety standards" and again opining that the "use of motorized craft should be eliminated." The document noted that "[n]on-motorized travel is more compatible with wilderness experience" and that "[m]otor noise levels may have adverse effects on pilot performance, resulting in potential safety hazards." The Park Service was unable, however, to document any difference in numbers and degree of injuries between the two types of craft.

The Park Service released the first Management Plan in December of 1979. Use of motorized watercraft between Lees Ferry and Separation Canyon was to be phased out over a five-year period. The 1979 Management Plan stated that such a phase-out was consistent with the "objective of the [1976] Master Plan[,] corresponded with the park wilderness proposal," and was "based on the extensive Colorado River Research project for the Grand Canyon[.]" The Management Plan increased the allocated commercial user days from 89,000 per

---

[3] "A 'user day' is calculated by multiplying the number of passengers by the number of days. (A 'day' is defined as any portion of a 24-hour day.) For example, if the [permit] holder has two clients on a two day trip, this would equal four user days." National Park Service, How a Commercial Use Authorization Works, https://cms.imr.nps.gov/bibe/parkmgmt/cua-operations.htm (last updated June 9, 2007).

year to 115,500 and increased the allocated non-commercial user days from 7,600 to 54,450. In September 1980, the Park Service proposed that the Colorado River Corridor be designated as "potential wilderness" and, once motorboat use was phased-out, as "wilderness."

Congress countermanded the 1979 Management Plan in a 1981 appropriations bill for the Department of the Interior. The bill prohibited the use of appropriated funds "for the implementation of any management plan for the Colorado River within the [Park] which reduces the number of user days or passenger-launches for commercial motorized watercraft excursions[.]" Members of Congress sent a letter to the Park Service expressing their "wish that the [1979 Management Plan] be amended to accommodate the 1978 level and pattern of commercial, motorized watercraft access while at the same time protecting the increased non-commercial allocation which the plan provides." The Park Service subsequently revised the 1979 Management Plan to "retain[ ] motorized use and the increase in user-days that had been intended as compensation for the phase-out of motors, resulting in more motorized use of the river."

The Park Service issued a second Management Plan in 1989. The 1989 Management Plan was similar to the revised 1979 Management Plan. It included the same allocation of user days for commercial and non-commercial boaters, but increased the number of non-commercial launches.

## B.   The 2006 Management Plan.

Planning for the 2006 Management Plan began in 1997 with the solicitation of public comments and a series of public workshops in Oregon, Utah, and Arizona. After this process was suspended and restarted following the filing of two lawsuits, the Park Service published in the Federal Register, on June 13, 2002, a notice of intent to prepare an environmental impact statement for a revised Management Plan. Seven addi-

tional public meetings and stakeholder workshops were held in Colorado, Utah, Arizona, Nevada, Maryland, and California. More than one thousand people attended the meetings and the Park Service received more than 13,000 written submissions.

In the Fall of 2004, the Park Service released for public review a Draft Environmental Impact Statement ("DEIS") for the revised Management Plan. The DEIS presented eight alternatives (Alternatives A-H) for managing the river from Lees Ferry to Diamond Creek, a stretch of 226 miles (referred to in this order as the "Lees Ferry Segment") and five alternatives (Alternatives 1-5) for managing the river from Diamond Creek to Lake Mead, a stretch of 51 miles (referred to in this order as the "Lower Gorge.") The alternatives included motorized and non-motorized options. Because of the complexity of the DEIS and the level of public interest, the Park Service extended the standard 90-day comment period for one additional month. The Park Service also hosted public meetings in Colorado, Utah, Washington, D.C., Nevada, Arizona, and California. The Park Service received some 10,000 written submissions, including approximately 6,000 substantive and 30,000 non-substantive comments on the DEIS. The Park Service coded, organized, analyzed, and responded to the substantive comments, and modified the DEIS where it felt modifications were warranted.

The Park Service received comments from a coalition of groups representing both commercial and non-commercial boaters of the Colorado River Corridor — groups often at odds with each other on issues of river management. The coalition included Intervenors, American Whitewater, and Grand Canyon River Runners Association. The coalition supported equal allocation of river time between commercial and non-commercial boaters and the continued authorization of appropriate levels of motorized use.

In November 2005, the Park Service issued the three-volume Final Environmental Impact Statement. The FEIS

addressed the same alternatives discussed in the DEIS, with some modifications to Alternatives H and 4, and expressed a preference for Modified Alternative H for the Lees Ferry Segment and Modified Alternative 4 for the Lower Gorge. The selected alternatives permitted the use of motorized rafts, generators for emergencies and inflating rafts, and helicopters to make passenger exchanges at the Whitmore helipad. As noted above, in February 2006, the Park Service issued a ROD that formally adopted Modified Alternatives H and 4 for the 2006 Management Plan.

## II. The District Court's Task.

Plaintiffs argue that the 2006 Management Plan is unlawful and should be set aside. The court's task is not to make its own judgment about whether motorized rafts should be allowed in the Colorado River Corridor. Congress has delegated that responsibility to the Park Service. The court's responsibility is narrower: to determine whether the Park Service's 2006 Management Plan comports with the requirements of the APA, 5 U.S.C. § 701 *et seq.*

The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). An agency's decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard is deferential. The court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and

whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

Plaintiffs assert that the 2006 Management Plan is arbitrary and capricious under the APA because it violates the Park Service's own policies, the National Park Service Concessions Management and Improvement Act ("Concessions Act"), and the National Park Service Organic Act ("Organic Act"). Each of these arguments will be addressed separately, and this opinion is precedential only as to those issues appealed.

### III.   Compliance with Park Service Policies.

#### A.   Enforceability of the Policies.

Even though Congress has never acted on the Park Service's recommendation to designate a substantial portion of the Park as wilderness, Plaintiffs claim that the Park Service's own policies give rise to a legally binding obligation to maintain the wilderness character of the Park. Plaintiffs claim that the Park Service has breached this legal duty by authorizing the continued use of motorized activities in the 2006 Management Plan. Defendants and Intervenors argue that the Park Service policies do not have the force and effect of law and therefore may not be enforced against the Park Service in this action.

In their motion for summary judgment, Plaintiffs identified three policies that allegedly create binding obligations on the Park Service: the 1976 Master Plan, the 1995 General Management Plan, and the 2001 Park Service Management Policies (the "2001 Policies"). Two of these arguments — the 1976 Master Plan and the 1995 General Management Plan —

are not on appeal. Plaintiffs instead focus on the 2001 Policies, arguing that they are binding because they are written in mandatory language, were mentioned in the Federal Register, and have been found binding in *S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178 (D. Utah 2005).

In *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131 (9th Cir. 1982), we established a two-part test for determining when agency pronouncements have the force and effect of law:

> To have the force and effect of law, enforceable against an agency in federal court, the agency pronouncement must (1) prescribe substantive rules — not interpretive rules, general statements of policy or rules of agency organization, procedure or practice — and (2) conform to certain procedural requirements. To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress.

*Id.* at 1136 (internal quotes and citations omitted).

**[1]** The 2001 Policies fail the first part of the *Eclectus Parrots* test because they do not purport to prescribe substantive rules. As the United States Court of Appeals for the District of Columbia Circuit recently held with respect to these very Policies: "While the text of the Policies on occasion uses mandatory language, such as 'will' and 'must,' the document as a whole does not read as a set of rules. It lacks precision in its directives, and there is no indication of how the enumerated policies are to be prioritized." *The Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006).

**[2]** The text of the 2001 Policies makes clear that they are intended only to provide guidance within the Park Service,

not to establish rights in the public generally. The Introduction describes the Policies as a "basic Service-wide policy document," as a "guidance document[ ]," and as a statement of policy "designed to provide [Park Service] management and staff with clear and continuously updated information . . . that will help them manage parks and programs effectively." That the 2001 Policies are not intended to have the same force as binding Park Service regulations is made clear by the Introduction's explanation that existing, formally-promulgated Park Service regulations will trump inconsistent provisions in the 2001 Policies until such time as the regulations "are formally revised through the rulemaking procedure[.]"

Equally significant, the Introduction to the 2001 Policies provides that Park Service management can choose to waive or modify the Policies: "Adherence to policy is mandatory unless specifically waived or modified in writing by the Secretary, the Assistant Secretary, or the Director." "Waivers and modifications will be considered on a case-by-case basis," the Policies explain. Needless to say, policy statements that may be waived or modified by an agency can hardly be said to have the binding force of law. As the D.C. Circuit noted, "this language does not evidence an intent on the part of the agency to limit its discretion and create enforceable rights. Rather, the agency's top administrators clearly reserved for themselves unlimited discretion to order and reorder all management priorities." *Wilderness Soc'y*, 434 F.3d at 596.

Nor do the 2001 Policies purport to create substantive individual rights or obligations for persons or entities outside the Park Service. The Policies set forth priorities, practices, and procedures to be followed by Park Service personnel in administering the national park system. In the words of *Eclectus Parrots*, they are "interpretive rules, general statements of policy or rules of agency organization, procedure or practice[.]" 685 F.2d at 1136 (quotes and citations omitted). *See also United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000) (agency rule did not have the force or

effect of law in part because "[i]t was not intended to create substantive rights in third parties"); *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000) (agency provision did not satisfy the *Eclectus Parrots* test, as it "creates no substantive rights" and instead "provides [agency] staff with internal procedures"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (whether an agency pronouncement affects individual rights and obligations "is an important touchstone for distinguishing those rules that may be binding or have the force of law") (internal quotation marks and citation omitted).

The 2001 Policies also fail the second part of the *Eclectus Parrots* test. The APA requires that "publication or service of a substantive rule shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d). The 2001 Policies were not published in the Federal Register. The Park Service did publish a notice of the availability of a draft of the 2001 Policies and a notice of new policy, but never published the 2001 Policies themselves. *See* 65 Fed. Reg. 2984 (Jan. 19, 2000); 65 Fed. Reg. 56003 (Sept. 15, 2000). What is more important, the Policies were never published in the Code of Federal Regulations. This suggests that the Park Service did not intend to announce substantive rules enforceable by third parties in federal court. *See W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (stating, in its determination that two agency documents did not satisfy the *Eclectus Parrots* test, that "[n]either [document] is published in the Federal Register or the Code of Federal Regulations"). The D.C. Circuit found this lack of publication "particularly noteworthy" in concluding that the 2001 Policies are not substantive law. *Wilderness Soc'y*, 434 F.3d at 595; *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) ("The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations[.]").

This conclusion is bolstered by the Park Service's own characterization of the 2001 Policies. In its Federal Register announcement that a draft of the 2001 Policies was available

for public comment, the Park Service explained that "park superintendents, planners, and other [Park Service] employees use management policies as a reference source when making decisions that will affect units of the national park system." 65 Fed. Reg. 2984 (Jan. 19, 2000). A "reference source," of course, is not the same as binding substantive law.

**[3]** In sum, the 2001 Policies are not enforceable against the Park Service in this action. The Policies do not prescribe substantive rules, nor were they promulgated in conformance with the procedures of the APA. *Eclectus Parrots*, 685 F.2d at 1136. The Court therefore may not set aside the 2006 Management Plan because it fails to comply with portions of the 2001 Policies requiring the Park Service to treat the Colorado River Corridor as wilderness or potential wilderness.

### B.   Plaintiffs' *Chevron* Cases.

Plaintiffs argue that the lack of formal rulemaking does not prevent the 2001 Policies from having the force and effect of law. For support, Plaintiffs rely primarily on *United States v. Mead Corp.*, 533 U.S. 218 (2001), and *S. Utah Wilderness Alliance*, 387 F.Supp.2d 1178. Plaintiffs in *Mead* challenged a tariff ruling by the United States Customs Service. Plaintiffs in *S. Utah Wilderness Alliance* challenged a decision by the Park Service to ban motorized vehicles in a portion of Canyonlands National Park. In both cases the courts were required to decide whether the agency decisions were entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The Supreme Court explained *Chevron* deference in this manner: when Congress has expressed an expectation that an agency will speak with the force of law and resolve ambiguities or fill gaps in statutory law, "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority . . . simply because the agency's chosen resolution seems unwise, but is obligated to accept the agency's

position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable[.]" *Mead*, 533 U.S. at 229 (citations omitted). In short, Courts are not to interfere with reasonable agency decisions rendered within areas where Congress has authorized the agencies to act.

[4] Among other considerations, a court applying the *Chevron* doctrine asks whether an agency decision is intended by Congress to have the force of law. The Supreme Court noted in *Mead* that the existence of formal notice-and-comment rulemaking is a strong indicator of such authority. The Supreme Court went on to explain, however, that "as significant as notice-and-comment rulemaking is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded[.]" *Id.* at 230-31. The District Court in *S. Utah Wilderness Alliance* relied on this language and found that *Chevron* deference was due the Park Service's decision to ban motorized vehicles in Canyonlands even though the decision was based on the 2001 Policies that were not adopted through formal notice-and-comment rulemaking. 387 F. Supp. 2d at 1187-88. Plaintiffs rely on this holding and the above-quoted language from *Mead* to argue that the same 2001 Policies should have the force and effect of law in this case.

There is a difference, however, between application of the *Chevron* doctrine in *SUWA* and the question to be decided in this case. The plaintiffs in *SUWA* argued that the 2001 Policies were not entitled to deference and that a decision based on them should be set aside. The District Court relied on the *Chevron* doctrine to conclude that the 2001 Policies provided a sound basis for deference to the Park Service — a shield for the agency's decision concerning the proper administration of Canyonlands National Park. Plaintiffs in this case seek an opposite result — to use the same 2001 Policies as a sword

to set aside Park Service decisions concerning the proper administration of Grand Canyon National Park.

**[5]** *Chevron* analysis does not control this case. Whether an agency's decision falls within the scope of activity intended by Congress to resolve ambiguities or fill gaps in the governing statutes and therefore is entitled to deference in the courts is a different question than whether an agency's decision becomes binding law that gives outside parties the right to enforce the decision against the agency in court. The first question asks whether the agency has acted within the realm and with the expertise Congress intended. The second focuses on the substance and form of the agency's action and asks whether the agency intended to promulgate binding law for itself and the outside world. This case presents the second question — a question to be decided under *Eclectus Parrots*. As explained above, the 2001 Policies are not enforceable against the Park Service under *Eclectus Parrots*.

### C.  The Policies Do Not Render the 2006 Management Plan Arbitrary and Capricious.

**[6]** Citing *Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), and related cases, Plaintiffs alternatively argue that the 2006 Management Plan is arbitrary and capricious even if the 2001 Policies do not have the force and effect of law. We held in *Ecology Center* that the Forest Service could not disregard a non-binding soil standard when the Forest Service's own environmental impact statement purported to comply with the standard. To disregard the standard, we held, would render the environmental impact statement misleading and unlawful. *Id.* at 1069. Plaintiffs argue that because the FEIS and ROD purport to follow the 2001 Policies and the 1995 General Management Plan, but in fact fail to do so, they are arbitrary and capricious. We do not agree.

Plaintiffs base their argument on the fact that the Colorado River Corridor has been classified by the Park Service as

potential wilderness. The 2001 Policies provide the following guidance with respect to the management of potential wilderness areas:

> The National Park Service will take no action that would diminish the wilderness suitability of an area possessing wilderness characteristics until the legislative process of wilderness designation has been completed. . . . This policy also applies to potential wilderness, requiring it to be managed as wilderness to the extent that existing non-conforming conditions allow. The National Park Service will seek to remove from potential wilderness the temporary, non-conforming conditions that preclude wilderness designation.

2001 Policies § 6.3.1 (SAR 016136-37). The FEIS makes this same commitment with respect to the Colorado River Corridor. *See* FEIS Vol. I at 234.

[7] The language of § 6.3.1 makes clear that the Park Service is required to manage potential wilderness areas as actual wilderness only "to the extent that existing non-conforming conditions allow." This language does not require the Park Service immediately to remove existing non-conforming uses — in this case, motorized rafts. It requires the Park Service to manage the Colorado River Corridor as wilderness to the extent possible given the existing use of motors. In light of this clear provision, the court cannot conclude that the 2006 Management Plan is arbitrary and capricious for failing to remove motorized uses in the Colorado River Corridor immediately.[4]

---

[4]Nor did Plaintiffs appear to believe that immediate removal was required when they submitted written comments on the DEIS. Plaintiffs did not assert that the 2001 Policies required the immediate removal of motorized uses, but instead endorsed a plan to "phas[e] out motorized use over a reasonable time period not to exceed 10 years." AR 050222.

Section 6.3.1 further states that the Park Service "will seek to remove from potential wilderness the temporary, non-conforming conditions that preclude wilderness designation." 2001 Policies § 6.3.1 (SAR 016137). Seasonal uses of motors on the river do not preclude wilderness designation. Plaintiffs do not contend that such uses work any permanent change on the Corridor that would preclude later wilderness treatment. Seasonal float trips are not like the construction of a road or other physical improvements that might disqualify an area for wilderness designation in the future. Motorized float trips can readily be eliminated if Congress decides that the Corridor should be designated as wilderness. The FEIS concludes that the use of motors in the Corridor "is only a temporary or transient disturbance of wilderness values" and "does not permanently impact wilderness resources or permanently denigrate wilderness values." FEIS, Vol. I at 17; *see also* AR 093108-19 (discussion of limited effect of motorized uses on soils), AR 093051 (same for water quality), AR 093083-84 (same for air quality), AR 093132-33 (same for natural soundscape).[5]

We note, additionally, that federal agencies are entitled to some leeway when interpreting their own policies and regulations. *Stinson v. United States*, 508 U.S. 36, 45 (1993) ("provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."). When that leeway is added to the Management Plan's general consistency with the 2001 Policies, the court cannot conclude that the policies, even if not enforceable in court, render the Management Plan arbitrary and capricious.

---

[5]During oral argument, Plaintiffs asserted that § 6.4.3.3 of the 2001 Policies, which precludes motors in "wilderness" areas, trumps § 6.3.1. It appears to the Court, however, that § 6.3.1 is the more relevant provision because it applies specifically to areas "possessing wilderness characteristics" that have not yet been designated as wilderness by Congress — precisely the circumstance of the Colorado River Corridor.

**[8]** Finally, Plaintiffs argue that the 2006 Management Plan is arbitrary and capricious because it contradicts earlier Park Service decisions to phase out motorized boating in the Colorado River Corridor. As noted above, the 1979 Management Plan called for motorized watercraft between Lees Ferry and Separation Canyon to be phased out over a five-year period. SAR 005244. The Court cannot conclude, however, that the 2006 Management Plan is arbitrary and capricious solely because it differs from earlier Park Service decisions. Part of the discretion granted to federal agencies is the freedom to change positions. As the Supreme Court has explained, "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983) (quotation omitted). The question posed by this lawsuit, therefore, is not whether the 2006 Management Plan differs from past Park Service decisions, but whether it is arbitrary and capricious in light of facts in the administrative record and the reasoning of the FEIS. For reasons explained herein, the court finds the 2006 Management Plan sufficiently reasonable to pass APA muster.

## IV. The Concessions Act.

**[9]** Plaintiffs contend that the 2006 Management Plan is arbitrary and capricious because it fails to comply with the requirements of the Concessions Act. The Act governs the granting of commercial concessions within the National Park System. "To make visits to national parks more enjoyable for the public, Congress authorized [the Park Service] to grant privileges, leases, and permits for the use of land for the accommodation of visitors. Such privileges, leases, and permits have become embodied in national parks concession contracts." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 805-806 (2003). The specific provision of the Act relied on by Plaintiffs articulates a Congressional "policy" for the granting of concessions:

It is the policy of the Congress that the development of public accommodations, facilities, and services in units of the National Park System shall be limited to those accommodations, facilities, and services that —

(1) are necessary and appropriate for public use and enjoyment of the unit of the National Park System in which they are located; and

(2) are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the unit.

16 U.S.C. § 5951(b).

Plaintiffs claim that the 2006 Management Plan is arbitrary and capricious because the Park Service never determined that the types and levels of motorized uses authorized by the Management Plan are necessary and appropriate for public use and consistent with the Park's resources and values. Before addressing this argument, we must address the legal standard that governs review of a Concessions Act claim.

### A.   Legal Standard Under the Concessions Act.

In support of their Concessions Act argument, Plaintiffs rely heavily on *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004), a case in which we struck down the Forest Service's grant of permits to commercial packstock operators in the Ansel Adams and John Muir Wilderness Areas of California. The court held that the Forest Service must make a finding that "the number of permits granted was no more than was necessary to achieve the goals of the Act." *Id*. at 647. Plaintiffs argue that *Blackwell* requires a similar Park Service finding for the number of motorized raft trips permitted in the 2006 Management Plan.

It is significant, however, that the court in *Blackwell* was applying the Wilderness Act, not the Concessions Act. The Wilderness Act places strict limitations on the use of lands formally designated by Congress as wilderness. With narrow exceptions, the Wilderness Act prohibits commercial enterprises, permanent roads, and motorized vehicles in wilderness areas. 16 U.S.C. § 1133(c). Federal agencies are obligated to manage such areas to preserve their wilderness character. *Id.* at § 1133(b). We explained in *Blackwell* that the Forest Service's obligation to limit commercial packstock permits "flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas." 390 F.3d at 647. It was this "ultimate interest" and "overarching purpose" of the Wilderness Act — to protect the Ansel Adams and John Muir Wilderness Areas from degradation — that led the Ninth Circuit to hold that the packstock permit decision violated "the Forest Service's statutory responsibility." *Id.* at 647-48.

This case, by contrast, does not concern a wilderness area. Congress has never acted on the Park Service's recommendation that portions of the Park be formally designated as wilderness. The Park Service, therefore, is not under the same "statutory responsibility" that applied to the Forest Service in *Blackwell*. The court must look to the Concessions Act, not the Wilderness Act, for the governing legal standard.

In *Wilderness Preservation Fund v. Kleppe*, 608 F.2d 1250 (9th Cir. 1972), we decided a case under 16 U.S.C. § 20, the statutory predecessor to the Concessions Act. *See City of Sausalito v. O'Neill*, 386 F.3d 1198, 1204 (9th Cir. 2004) (*Kleppe* decided under predecessor to Concessions Act); Pub. L. 105-391, 1123 Stat. 3515 (16 U.S.C. § 20 superceded by 16 U.S.C. § 5951). The predecessor statute, like the Concessions Act, stated a Congressional "policy" that commercial concessions in national parks should be "limited to those that are necessary and appropriate for public use and enjoyment of the national park area in which they are located." *Kleppe*, 608

F.2d at 1253. In rejecting a challenge under this policy to the Park Service's allocation of rafting permits in the Colorado River Corridor, *Kleppe* recognized the "administrative discretion" granted the Park Service and invoked "a judicial presumption favoring the validity of administrative actions." *Id.* at 1254.

**[10]** This more deferential standard appears to be warranted. The Park Service is charged with administering almost 400 national parks. *See* National Park Service, About Us, http://www.nps.gov/aboutus/index.htm (last visited October 22, 2009). The Concessions Act does not impose strict wilderness requirements on those parks, but instead articulates a policy that calls for the Park Service to balance the interests of public use and resource preservation. 16 U.S.C. § 5951(b). The Park Service's balancing of those interests over the broad range and diverse circumstances of hundreds of national parks is appropriately accorded the kind of deference recognized in *Kleppe*. The Court concludes that the deferential approach of *Kleppe*, rather than the statutory application of the Wilderness Act in *Blackwell*, should govern this case.

**B.  The 2006 Management Plan and the Concessions Act.**

Plaintiffs first contend that the Park Service failed entirely to determine that the types and levels of commercial services authorized by the 2006 Management Plan are necessary and appropriate. We disagree. The Park Service made the following determinations:

> Since many visitors who wish to raft on the Colorado River through Grand Canyon possess neither the equipment nor the skill to successfully navigate the rapids and other hazards of the river, the [Park Service] has determined that it is necessary and appropriate for the public use and enjoyment of the park to provide for experienced and professional

river guides who can provide such skills and equip-
ment.

***

[S]ervices provided by commercial outfitters, which
enable thousands of people to experience the river in
a relatively primitive and unconfined manner and
setting (when many of them otherwise would be
unable to do so), are necessary to realize the recre-
ational or other wilderness purposes of the park.

FEIS Vol. I at 19.

Plaintiffs argue that although the Park Service may have
found commercial outfitters to be necessary and appropriate
generally, it never made such a finding for *motorized* com-
mercial services. Again we disagree. The ROD specifically
states that "[d]etermination of the *types and levels* of commer-
cial services that are necessary and appropriate for the Colo-
rado River through Grand Canyon National Park were
determined through [the FEIS]." ROD at 6 (emphasis added).
Among the eight management alternatives considered by the
Park Service in the DEIS and FEIS were two that did not
authorize any motorized uses in the Colorado River Corridor
(Alternatives B and C). After evaluating these alternatives, the
Park Service found that they "violated the basic premise of
this planning effort; that of reducing congestion, crowding
and impacts without reducing access of visitors to the Colo-
rado River[.]" FEIS Vol. III at 373. "As demonstrated by the
Park Service's analysis of the no-motor alternatives, a deci-
sion by the Park Service to eliminate the motorized trip option
would cause a dramatic reduction in the public availability of
professionally outfitted river trips[.]" *Id.* at 87. The Park Ser-
vice explained that "continued authorization of motorized use
for recreational river trips in the [Park] is essential . . . to
meeting the . . . management objectives" for the 2006 Man-
agement Plan. *Id.* Thus, the Park Service quite clearly con-

cluded that motorized commercial services were "necessary and appropriate for public use and enjoyment" of the Corridor. 16 U.S.C. § 5951(b).

Plaintiffs contend that even if the Park Service found that motorized services were necessary and appropriate, it made no determination as to the *amount* of such services that are necessary, and therefore failed to "limit" motorized uses to those that are necessary and appropriate as required by the Congressional policy statement of the Concessions Act. It is true that the FEIS and ROD do not contain a specific discussion of the amount of motorized traffic found necessary and appropriate for public use and enjoyment of the Corridor. But the absence of such a specific discussion does not necessarily require the agency's action to be overturned. "While [a court] may not supply a reasoned basis for the agency's action that the agency itself has not given, [the court] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citations omitted). The Park Service's consideration of the amount of motorized traffic required in the Colorado River Corridor can reasonably be discerned from the FEIS.

The 1989 Management Plan established use levels that were still in effect when the 2006 Management Plan planning process began. Among the alternatives considered in the DEIS and FEIS was a "no-action alternative" — an alternative that would have left the 1989 levels in place. This alternative, designated in the FEIS as Alternative A, would continue to allocate 113,083 user days to commercial operators (74,260 motorized and 38,823 non-motorized) and 58,048 user days to non-commercial users. FEIS Vol. I at 45. Alternative B would have eliminated all motorized traffic on the river and allocated 97,694 user days to commercial operators and 74,523 to non-commercial. *Id*. at 47. Alternative C also would have eliminated all motorized trips, but would have increased commercial user days to 166,814 and non-commercial to 115,783,

presumably to accommodate sufficient numbers of visitors with the slower non-motorized trips. *Id*. at 49. Alternatives D, E, F, and G would have permitted motorized uses, but varied the amounts for commercial and non-commercial traffic. *Id*. at 51-57. The levels of motorized user days for Alternatives D, E, F, and G would have been 70,104, 76,913, 83,076, and 76,913, respectively. *Id*.

User days were not the only variables evaluated by the Park Service. The FEIS also considered months without motors on the river, trip lengths, trip lengths during various parts of the year, group sizes, numbers of launches, numbers of passengers, and helicopter exchanges at the Whitmore helipad. *Id*. at 61. The Park Service evaluated these alternatives against environmental, social, and park-management factors including impacts on soils, water, air, soundscape, caves, vegetation, terrestrial life, aquatic resources, special status species, cultural resources, visitor experience, socio-economic resources, park management and operations, adjacent lands, and wilderness character. *Id*. at 61-65.

The Park Service ultimately concluded that Alternatives B and C — the non-motor alternatives — would not meet the agency's objective of providing "a diverse range of quality recreational opportunities for visitors to experience and understand the environmental interrelationships, resources, and values of Grand Canyon National Park" because of the significantly reduced number of visitors who could experience the Colorado River Corridor. *Id*. at 71; *see* FEIS Vol. II at 626-27, 630-31. The Park Service evaluated a range of motorized use times in the other alternatives and, after considering all factors and variables, selected Modified Alternative H. That Alternative included specific allocations for motorized and non-motorized uses: a total of 115,500 commercial user days consisting of 76,913 motorized and 38,587 non-motorized, and an estimated 113,486 non-commercial user days. FEIS Vol. I at 60.

Modified Alternative H reduced the amount of motorized traffic in the Colorado River Corridor and the months within which it can occur, while significantly increasing the traffic for non-commercial uses. The time period during which it prohibited motorized uses in the Corridor each year is September 16 through March 31 — 3.5 months longer than under the 1989 Management Plan. FEIS Vol. I at 61. Modified Alternative H also reduced motorized commercial launches from 473 per year to 429 per year, and total motorized passengers from 14,487 to 13,177. *Id.* at 45, 60. Maximum group sizes for commercial motor excursions were also reduced from 43 to 32. *Id.* at 61. Commercial user days were held essentially level at 115,500, while non-commercial user days were more than doubled to an estimated 113,486. *Id.* at 60.[6]

[11] In sum, the Park Service's decision concerning the amount of motorized trips on the river was made after considering competing alternatives and a significant number of variables. The Park Service chose an alternative that reduced motorized uses from current levels. The court is satisfied that the Park Service, as stated in the ROD, determined the "type and level" of traffic on the river that was "necessary and appropriate," including the type and level of motorized uses. ROD at 6.

Plaintiffs argue that even if the Park Service made such a determination, the determination was arbitrary and capricious. As noted above, however, the decision occurred only after an extensive analysis of various alternatives. Defendants have identified a number of factors in the Administrative Record

---

[6]The Park Service considered five alternatives for the Lower Gorge, including a no-action alternative (Alternative 1), but the Lower Gorge issues differed from those in the Lees Ferry Segment. Plaintiffs have spent little time addressing Lower Gorge issues in this case. The Lower Gorge management is complicated by the existence of Hualapai tribal lands and Hualapai River Runner day trips. After undertaking an analysis of five alternatives, the Park Service selected Alternative 4, which eliminated up-river jet boat tours. FEIS Vol. I at xiii.

that support the Park Service's decision to allow motorized traffic to continue. First, because motorized trips take less time to complete (10 days as opposed to 16 days for non-motorized trips), substantially more people can see the Park each year from the river if motorized trips continue. FEIS Vol. I at 33-34; Vol. III at 87-88, 328-29. Second, motorized trips are frequently chartered for special-needs groups, educational classes, family reunions, or to support kayak or other paddle trips. Third, because of their increased mobility, motorized trips help alleviate overcrowding at popular campsites and attractions in the Corridor. FEIS Vol. I at 33-34; Vol. III at 302. Fourth, some individuals feel safer when traveling in motorized rafts. FEIS Vol. III at 312-313. In addition, studies performed as part of the DEIS found that visitors are able to experience the river as wilderness in the presence of motorized uses and that those who took motorized trips were significantly more likely to stress safety and trip length as the most important factors in the choosing the type of trip they took.

**[12]** Given the "judicial presumption favoring the validity of administrative actions" and the "administrative discretion" granted the Park Service under the Concessions Act, *Kleppe*, 608 F.2d at 1254, the court cannot conclude that the agency acted arbitrarily and capriciously when it found that the Modified Alternative H levels of motorized uses were "necessary and appropriate for public use and enjoyment" of the Colorado River Corridor. 16 U.S.C. § 5951(b). The question is not whether this court agrees with the Park Service's decision, but whether it is reasonably supported by the Administrative Record. In light of the DEIS and FEIS analysis outlined above, we conclude that it is.

Plaintiffs spend little time addressing the other policy statement of the Concessions Act — that the necessary and appropriate public uses should be "consistent to the highest practicable degree with the preservation and conservation of the resources and values of the unit." 16 U.S.C. § 5951(b).

Read in isolation, this policy could eliminate all public uses of the Colorado River Corridor, motorized and non-motorized, because preservation of the natural resources of the Corridor would be accomplished to the "highest practicable degree" by eliminating all human interference. This is not what Congress intended. The Concessions Act, after all, authorizes the Park Service to permit commercial concessions in national parks. Rather, this policy must be achieved in light of the policy's preceding requirement — that uses be limited to those necessary and appropriate for public use of the parks. Once those necessary uses are identified, they must be managed to the highest practicable degree to preserve the resources and values of the Park.

We are satisfied that the Park Service did not act arbitrarily and capriciously when it concluded that Modified Alternative H was consistent to the highest practicable degree with preserving the resources and values of the Corridor. As noted above, the DEIS and FEIS evaluated Modified Alternative H and other alternatives against a large number of environmental factors. With the exception of the effects of motors on the soundscape of the Park, Plaintiffs do not challenge this evaluation. With respect to the effects on soundscape, we conclude that the Park Service did not act arbitrarily and capriciously.

## V.   The Organic Act.

[13] The Organic Act provides that the Park Service "shall promote and regulate the use of . . . national parks . . . in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. The Act also provides that "[n]o natural curiosities, wonders, or objects of interest shall be leased, rented, or granted to anyone on such terms as to interfere with free access to them by the public[.]" 16 U.S.C. § 3. Plaintiffs contend that the 2006 Management Plan is arbitrary and capricious because it permits commercial boaters to use the river at levels that interfere with free access by the public, and because it concludes that

motorized uses do not impair the natural soundscape of the Park.

## A.   Free Access.

[14] Plaintiffs argue that the allocation of river access between commercial and non-commercial users is inequitable and thus limits the free access of members of the public. As noted above, however, the Park Service has significantly increased the access of non-commercial users. The 2006 Management Plan allocates 115,500 user days to commercial users and an estimated 113,486 user days to non-commercial users. *See* FEIS Vol. I at ix.[7] This is essentially the same allocation commercial users received under the 1989 Management Plan, but a substantial increase from the 58,048 user days that non-commercial boaters received under the 1989 plan. Stated in different terms, the allocation of river time between commercial and non-commercial user days changed from 66.5% commercial and 33.5% non-commercial under the 1989 Management Plan, to 50.4% commercial and 49.6% non-commercial under the 2006 Management Plan. The 2006 Management Plan also reduced the number of launches and passengers for commercial users while nearly doubling both categories for non-commercial users. FEIS Vol. I at 45, 60. It is noteworthy that neither GCROA, which consists of commercial river users, nor GCPBA, which consists of non-commercial users, agree with Plaintiffs. Both organizations

---

[7]Plaintiffs argue that user days are not a fair measure of use. While the Park Service has stated that "[d]aily launches are probably the most important use measure for measuring impacts to visitor use and experience," it also has noted that "[t]he daily number of people launching would probably provide similar information[.]" FEIS Vol. III at 55. The court finds that user days — a factor of the number of people that launch and the number of days the trip lasts — is a reasonable basis for analysis. The Ninth Circuit used the same measure in *Kleppe*. *See* 608 F.2d 1250.

contend that the Park Service's allocation of user days is reasonable.[8]

[15] Plaintiffs argue that non-commercial users are required to wait for permits to run the river — sometimes for 10 or more years — while clients of commercial rafting companies usually can book a trip within one year. They also assert that the current allocation favors the wealthy who can afford commercial trips, and they criticize the Park Service for not conducting a demand study that would have revealed the most equitable allocation. The court cannot conclude on this basis, however, that the Management Plan is arbitrary and capricious. The 2006 Management Plan significantly revised the system for private boaters to obtain permits by establishing a lottery system that is weighted to favor those who have not received a permit in previous years. ROD at 20. Moreover, surveys show that 61% of private boaters have floated the Colorado River Corridor before, while only 20% of commercial boaters were on repeat trips. The existence of a waiting list therefore does not necessarily show that more private boaters than commercial customers are awaiting their first river trip. Finally, experts advised the Park Service that a demand study would cost more than $2 million and likely would be of limited value. FEIS Vol. III at 177.

---

[8]Plaintiffs complain that a substantial portion of the additional non-commercial days are in the winter, and that the Park Service acted without evidence that boaters would use the river in the winter. Defendants note that the 2006 Management Plan increases non-commercial user days in all seasons of the year. The FEIS also notes that "there is interest in trips during the winter . . . . [W]inter trips offer greater opportunities for quiet and solitude compared to other times of the year. The less crowded nature of winter months enhances wildlife viewing and cooler daytime temperatures are conducive to off-river hiking." FEIS Vol. I at 34 (emphasis omitted). Ninety percent of available winter dates were used between 1998 and 2002 — 100% when they were made available six months in advance. AR 107920, 109498. The court concludes that the Park Service had a reasonable basis for concluding that winter trips would be used by non-commercial boaters.

More generally, Plaintiffs tend to characterize the dispute as one between commercial companies and private citizens. This is not the true nature of the issue:

> Throughout these proceedings [plaintiff] has persisted in viewing the dispute as one between the recreational users of the river and the commercial operators, whose use is for profit. It asserts that by giving a firm allocation to the commercial operators to the disadvantage of those who wish to run the river on their own the Service is commercializing the park. [Plaintiff] ignores the fact that the commercial operators, as concessioners of the [Park] Service, undertake a public function to provide services that the [Park Service] deems desirable for those visiting the area. The basic face-off is not between the commercial operators and the non-commercial users, but between those who can make the run without professional assistance and those who cannot.

*Kleppe*, 608 F.2d at 1253-54 (internal citations omitted).

As noted above, a coalition of commercial and private boater organizations submitted joint comments to the Park Service that supported an equal allocation of river time between commercial and non-commercial users on an annual basis. These users of the river apparently did not believe that such a system would interfere with free access.[9]

---

[9]In support of their argument, Plaintiffs submitted the affidavit of Donald W. Walls. Dkt. #71-2. Dr. Walls opines that an equal allocation between commercial and non-commercial boaters cannot be determined to be fair in the absence of a demand study, and that a lottery system that applies to all users would be more fair. As noted above, however, a panel of experts advised the Park Service in January of 2003 that a demand study was likely to cost $2 million and be of limited use. FEIS Vol. III at 177. Dr. Walls does not address this advice and therefore does not provide a basis for concluding that the Park Service acted arbitrarily and capriciously when it decided not to conduct such a study. Moreover, although

### B. Impairment of the Natural Soundscape.

Plaintiffs make several arguments in support of their claim that the Park Service acted arbitrarily and capriciously when it concluded that motorized uses of the Corridor do not impair the natural soundscape of the Park within the meaning of the Organic Act. These arguments are unpersuasive.

First, Plaintiffs contend that the Park Service used the wrong baseline — that it compared motor-generated sounds to the noise of the Corridor with aircraft flying overhead, rather than comparing motorized noises to the natural quiet of the Park. This argument is incorrect. The Park Service compared periods of noise from river traffic (motorized and non-motorized) to periods when there was no noise. FEIS Vol. II at 348-87. The Park Service also evaluated the length of "noise-free intervals" when motorized traffic was in the Park. *See, e.g., id.* at 386.

Plaintiffs next contend that the Park Service failed to consider the cumulative effects of noise from river traffic. This also is incorrect. After comparing river traffic noise to natural background sounds, and evaluating noise-free intervals, the Park Service considered the cumulative effect of such noise when added to other sounds in the Park such as aircraft over-

---

Dr. Walls opines that a lottery system would be more fair than the Park Service's equal allocation of days between commercial and non-commercial users, he does not address whether such a system — which would render the yearly demand for commercial services less predictable — would permit the continued operation of commercial river runners that the Park Service has found to be necessary and appropriate. Nor does Dr. Walls address the fact that a coalition of river users, including commercial and private users, supported the equal allocation adopted by the Park Service, or explain why the Park Service's consideration of such representative support was unreasonable. Dr. Walls' opinion, although a legitimate point of view, does not persuade the court that the Management Plan is arbitrary and capricious.

flights. The Park Service then reached the following conclusion:

> Although Modified Alternative H would contribute to the overall cumulative effects of noise on the park's natural soundscape, even if all noise from all river recreation was eliminated from the park (including river-related helicopter flights at Whitmore), the cumulative effects of aircraft noise would still be adverse, short- to long-term, and major. There would still be 'significant adverse effects' on the natural soundscape due to frequent, periodic and noticeable noise from overflights, and 'substantial restoration of natural quiet' would not be achieved as required by Public Law 100-91 and other mandates.

*Id.* at 387 (emphasis omitted).

Plaintiffs contend that this cumulative analysis should have caused the Park Service to eliminate sounds from motorized river traffic. But if a cumulative analysis were to result in the elimination of all sounds that can be eliminated by the Park Service — in this case, all sounds other than aircraft overflights, which are not within the jurisdiction of the Park Service — then all human activity in the Park would be eliminated. And still the aircraft overflights would create substantial and adverse sound effects in the Park. Plaintiffs have articulated no principled basis upon which the court can conclude that the Park Service should have eliminated motorized noises on the basis of such cumulative analysis, but not other human-caused noises such as hiking or non-motorized raft trips. The court cannot conclude that the Park Service acted arbitrarily and capriciously when it concluded from a cumulative-effects analysis that motorized river traffic noise was not the source of serious sound problems in the Park and that elimination of such noise would not significantly improve the overall soundscape.

Finally, Plaintiffs argue that the Park Service failed to consider earlier environmental impact statements and a number of studies conducted in the 1970s, some of which found that river use impacted the soundscape within the Park. The Park Service relied primarily on studies conducted by noise experts in 1993 and 2003. FEIS Vol. II at 352-53. These studies included field acoustic measurements, including sounds from motorized and non-motorized raft trips. The studies determined the distance at which motorized rafts could be heard and the length of time they were audible while traveling down-river, when measured from fixed points in the Park. *Id.* The studies also evaluated the effects of other sounds such as water flow, wind, wildlife, human voices, helicopters, and aircraft overflights. *Id.* The studies provide a reasonable basis for evaluating sound effects within the Park.

Plaintiffs argue that the Park Service failed to consider 28 previous studies, but they identify no specific studies for the court to consider. Nor do Plaintiffs cite any recent studies that call into question the findings of the 1993 and 2003 studies. Defendants also note that any studies conducted in the 1970s would have concerned louder two-stroke engines rather than the quieter and cleaner four-stroke engines now used in the Corridor. Finally, the 2003 study specifically considered and summarized the earlier studies relied on by Plaintiffs.

**[16]** Given all of these considerations, the court cannot conclude that the Park Service acted arbitrarily and capriciously when it concluded that motorized uses do not impair the soundscape of the Park within the meaning of the Organic Act.

## VI.   Conclusion.

**[17]** Plaintiffs have failed to establish that the Park Service acted arbitrarily and capriciously when it adopted the 2006 Management Plan. The court accordingly AFFIRMS the granting of the summary judgment motions of Defendants and

Intervenors and the denial of the summary judgment motion of Plaintiffs.

**AFFIRMED.**